# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-80029-CIV-MIDDLEBROOKS

TOM MAHONEY,

      Plaintiff,

v.

TT OF PINE RIDGE, INC.,

      Defendant.

_____/

## ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL ORDER AND JUDGMENT, AND GRANTING IN PART PLAINTIFF'S UNOPPOSED MOTION FOR ATTORNEYS' FEES, COSTS AND EXPENSES, AND A CLASS REPRESENTATIVE SERVICE AWARD

THIS CAUSE comes before the Court on Plaintiff Tom Mahoney's ("Plaintiff") Unopposed Motion for Entry of Final Approval Order (DE 63) ("Final Approval Motion"), filed on October 25, 2017, and Unopposed Motion for Attorneys' Fees, Costs and Expenses, and a Class Representative Service Award (DE 60) ("Fees and Costs Motion"), filed on October 18, 2017 (collectively, the "Motions"). Having reviewed the record and heard oral argument at the final fairness hearing before the Court on November 1, 2017, and noting no objections have been filed and no objections were presented at the final fairness hearing, Plaintiff's Unopposed Motion for Final Approval Order and Judgment is granted, and Plaintiff's Unopposed Motion for Attorneys' Fees, Costs and Expenses, and a Class Representative Service Award is granted in part.

## BACKGROUND

This matter came before the Court on Plaintiff's Complaint, filed individually and on behalf of a class on January 9, 2017, alleging that Defendant TT of Pine Ridge, Inc., doing

business as Naples Nissan ("Defendant") violated the Telephone Consumer Protection Act ("TCPA"), 42 U.S.C. § 227, filed on January 9, 2017. (DE 1). Plaintiff alleges that beginning in the fall of 2016, Defendant began calling Plaintiff without Plaintiff's consent, using an automatic telephone dialing system ("ATDS") to send prerecorded telemarketing robocalls advertising Defendant's services. (DE 1 ¶¶ 22-26). According to the Complaint, Plaintiff seeks injunctive relief against Defendant from engaging in future telemarketing violations of the TCPA, certification of a class under Fed. R. Civ. P. 23, statutory damages of $500.00 per TCPA violation and treble damages for any willful or knowing violations, and attorneys' fees and costs. (DE 1 ¶ 46).

The Parties proceeded to engage in discovery and litigate the matter, which included Defendant's filing of a Motion for Summary Judgment or, in the Alternative, to Dismiss (DE 32), which was fully briefed (DE 46). On May 3, 2017, the Parties jointly filed a Notice of Pending Settlement and Joint Motion for Stay of Proceedings, which stated that the Parties have reached an agreement to settle the matter as part of a class settlement, and requested a thirty (30) day stay of proceedings while the agreement was finalized (DE 41), which the Court granted (DE 49). Plaintiff filed an Unopposed Motion for Preliminary Approval of Class Action Settlement Agreement (DE 52) on June 9, 2017, seeking to have the Court preliminarily certify a class and approve the Settlement Agreement (DE 52-1), which the Court granted on June 26, 2017 (DE 54). On October 18, 2017, Plaintiff filed the Fees and Costs Motion (DE 60), and on October 25, 2017, Plaintiff filed the Final Approval Motion (DE 63). The Court held a final fairness hearing on November 1, 2017, where the Court heard oral argument from Plaintiff's and Defendant's counsel on why the Court should grant the Motions. No objections to the Settlement Agreement were filed or raised at the final fairness hearing. Pursuant to the Court's request at the final

2

fairness hearing and endorsed order (DE 65), Plaintiff's counsel filed supplemental documentation of its hours worked on this litigation and accompanying an memorandum of law on November 3, 2017. (DE 68).

## DISCUSSION

I.      Class Certification

Rule 23 of the Federal Rules of Civil Procedure governs the requirements and procedures for class actions in federal court. Fed. R. Civ. P. 23. There are four prerequisites to a district court's certification of a class under Rule 23, including "numerosity, commonality, typicality, and adequacy of representation" of the class, and those prerequisites "are designed to effectively limit class claims to those fairly encompassed by the named plaintiffs' individual claims." *Valley Drug Co. v. Geneva Pharm.., Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003) (internal quotations and citations omitted); Fed. R. Civ. P. 23(a)(1)-(4). Numerosity is generally satisfied when there are more than forty putative class members. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). Commonality is satisfied when there is "at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009). Typicality is satisfied where is "a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Adequacy of representation is satisfied when "plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation," and when "plaintiffs [do not] have interests antagonistic to those of the rest of the class." *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985). "Failure to establish any one of these four factors and at least one of the

alternative requirements of Rule 23(b) precludes class certification." *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615-18 (1997)).

Under Fed. R. Civ. P. 23(b)(3), a class action may be maintained if "the court finds that the questions of law or fact common to all class members predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Carter v. Forjas Taurus, S.A.*, __ F. App'x __, 2017 WL 2813844, at *4 (11th Cir. 2017) (per curiam). Importantly, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Windsor*, 521 U.S. at 620.

Here, the Court finally certifies Plaintiff's putative class because the purported class meets all of the Rule 23(a) prerequisites and satisfies Rule 23(b)(3). Where, as here, parties reach a class action settlement agreement before the putative class is certified, a court must examine whether the putative class meets the prerequisites of Rule 23(a) and at least one of the types of classes under Rule 23(b). The Court already preliminarily approved a settlement class in this case as the following:

> All persons or legal entities in the United States who, during the Class Period, received a non-emergency call, text, or voicemail message from or on behalf of Naples Nissan through the use of an automatic telephone dialing system or an artificial or prerecorded voice.

(Settlement Agreement, ¶ 2.42; DE 54 at 2). The Court also preliminarily found that "certification for purposes of settlement is proper" because the putative class met all of the Rule 23(a) prerequisites and met the Rule 23(b)(3) requirement that "a class action is the superior

4

means of resolving this Action." (DE 54 at 2). Consistent with the Court's preliminary class certification, the Court finally certifies the Settlement Class. First, the putative class satisfies the numerosity requirement, as there are a total of 374,399 individuals in the class. (DE 61-1, Azari Decl. ¶ 13). Second, commonality is satisfied because the common issue of fact as to all class members is whether they received a non-emergency call, text, or voicemail message using an ATDS or an artificial or prerecorded voice from Defendant. This common factual question leads to common legal questions, such as whether the common facts constitute a violation of the TCPA. (DE 63 at 12). Third, typicality is satisfied because Plaintiff and the putative class members all allegedly received some non-emergency voicemail messages using an ATDS or an artificial or prerecorded voice from Defendant, and the relief that Plaintiff and class members would be entitled to is nearly identical. (DE 63 at 12). Fourth, adequacy of representation is satisfied because Plaintiff's counsel has demonstrated that it is capable of handling complex litigation, including class action lawsuits, and because Plaintiff has no interests that are in conflict with the rest of the class. (DE 52, Ex. 2; DE 60, Miltenberger Decl., Hill Decl.; DE 63 at 12-13). Finally, the Court finds that Rule 23(b)(3) is satisfied because in light of the foregoing questions of fact and law common to all members of the class, and the large number of putative class members, a class action is a superior way to vindicate the rights of all putative class members than if each member were to litigate their individual TCPA claims. Accordingly, Plaintiff's class is certified for the purposes of settlement.

II.     Final Approval of Settlement Agreement

      a.  *Notice to Class Members*

Specifically, "Rule 23(e) . . . requires that a settlement or compromise of a class action be approved by the district court." *Bennett v. Behring Corp.*, 737 F. 2d 982, 986 (11th Cir. 1984).

Rule 23(e) lays out the procedures that a district court must follow before approving a class action settlement. Fed. R. Civ. P. 23(e). First, the court must ensure that "notice [is given] in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Class members must be "given information reasonably necessary to make a decision [whether] to remain a class member and be bound by the final judgment or opt out of the action." *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011). In an action certified under Rule 23(b)(3), "class members should receive 'the best notice that is practicable under the circumstances.'" *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 691 (S.D. Fla. 2014) (quoting Fed. R. Civ. P. 23(c)(2)(B)). A claiming process such as "completing a one-page form and submitting it either online or by mail" is not "particularly difficult or burdensome." *Poertner v. Gillette Co.*, 618 F. App'x 624, 628 (11th Cir. 2015) (per curiam).

After the class was certified for the purpose of settlement, the Settlement Administrator reviewed data files containing 380,858 unique affected phone numbers and Defendant's client list. (DE 61-1, Azari Decl. ¶ 13). After sorting out class members with multiple phone numbers, the Settlement Administrator identified a Settlement Class of 374,399 total members. (DE 61-1, Azari Decl. ¶ 13). Of the class members, the Settlement Administrator identified 193,902 records of potential members of the Settlement Class that had an email or mailing address, which resulted in the Settlement Administrator sending 10,193 Summary Email Notices to potential Settlement Class Members who had a valid email address, and 183,709 Summary Postcard Notices to Settlement Class Members with a mailing address but no associated email address. (*Id.* ¶¶ 16, 19). In total, after multiple attempts at reaching certain Settlement Class Members whose emails or postcards were initially returned as undeliverable, the Settlement Administrator

estimated that it reached 192,229 unique Settlement Class Members with the Summary Email and Postcard Notices. (*Id.* ¶ 22).

To reach more of the Settlement Class, since "[n]early all class members on the Class List had local Florida telephone numbers," the Settlement Administrator published a Publication Notice in two Naples, Florida area newspapers with an approximate combined circulation of 82,049. (*Id.* ¶ 23). A Settlement Website was also set up to notify Settlement Class Members of the Settlement Agreement and to allow Settlement Class Members to submit claims. (*Id.* ¶ 26). The Settlement Website received 10,398 unique visitors and 55,229 page views. (*Id.* ¶ 27). A toll-free number and postal mailing address were established to allow Settlement Class Members to find out information about the Settlement Agreement. (*Id.* ¶ 28). In addition to submitting a claim through the Settlement Website, a Settlement Class Member could submit a claim by a written claim form. (Settlement Agreement, ¶ 2.8). Eight (8) members of the Settlement Class requested to be excluded from the Settlement Class. (DE 61-1, Azari Decl. ¶ 30). In sum, the Settlement Administrator estimated that it reached approximately 70.1% of the total Settlement Class. (*Id.* ¶ 12). The Claim Form was not particularly burdensome, as it was just one page long. (DE 61-1, Ex. 4). Settlement Class Members had to submit a Claim Form within sixty (60) days after the Initial Notice Date, or by September 15, 2017 to be eligible to receive an award. (DE 63 at 6; Settlement Agreement, ¶ 3.5(a)). Although just 7,638 Settlement Class Members filed a claim or requested to be excluded from the class, the Court finds that notice to the class was reasonable and the best notice practicable under the circumstances, consistent with

7

Rule 23(e)(1) and Rule 23(c)(2)(B).  (*See* DE 68 at 12 (adding 7,267 cash award claims,[1] 363 voucher award claims, and 8 individuals requesting to be excluded)).

> b. *Settlement Agreement*

Second, a "court may approve [a settlement agreement] only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e).  To finally approve a class-action settlement agreement, a court must find that:

> [T]here was no fraud or collusion in arriving at the settlement and that the settlement was fair, adequate and reasonable, considering (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986.  In addition, "[d]etermining the fairness of the settlement is left to the sound discretion of the trial court and [an appellate court] will not overturn the court's decision absent a clear showing of abuse of discretion."  *Id.*  "[T]he Court's role in reviewing a settlement agreement is 'akin to the high duty of care that the law requires of fiduciaries."  *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1320 (quoting *Synfuel Tech, Inc. v. DHL Express (USA) Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)).  Generally, "the district court 'should be hesitant to substitute its own judgment for that of counsel."  *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)[2]).  "There exists 'an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being the most complex."  *Lipuma v. Am.*

---

[1] In Plaintiff's Supplemental Brief, it gives two alternative figures for the number of cash awards claimed: 7,267 (DE 68 at 12), and 7,269 (DE 68 at 3 n.1).  The exact number does not have a material effect on the Court's analysis, and the Court will use the 7,267 figure for cash awards claimed throughout this Order.

[2] The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

*Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (internal quotations and citations omitted).

i.      *No Fraud or Collusion*

First, the settlement here does not appear to be the product of collusion. "Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Saccoccio*, 297 F.R.D. at 692. Here, the Parties participated in mediation in front of Mediator Bruce Friedman, and, "through the assistance of Mr. Friedman, continued settlement discussion following the mediation and reached terms on a proposed class settlement." (DE 52 at 2; DE 41; Settlement Agreement, ¶ 1.3). However, the Court also notes that the Settlement Agreement contains a "clear sailing" agreement, whereby "the defendant agrees not to contest class counsel's fee petition as long as it does not exceed a specified amount." 4 William B. Rubenstein, *Newberg on Class Actions* § 13:9 (5th ed. 2011); *Poertner*, 618 F. App'x at 630 n.6. Here, Defendant agreed not to object to Plaintiff's counsel's request for attorneys' fees up to $500,000, and for costs up to $20,000. (Settlement Agreement, ¶ 4.2). Despite this clear sailing agreement, any indicia of collusion is "belied by the . . . [fact that] the parties settled only after engaging in extensive arms-length negotiations moderated by an experienced . . . mediator." *Poertner*, 618 F. App'x at 630. Accordingly, since the Settlement Agreement was "the result of those discussions and arms-length negotiations" (DE 63 at 3), the Court finds there was no fraud or collusion in arriving at the settlement.

ii.     *Likelihood of Success at Trial*

"Plaintiff's likelihood of success at trial is not only the first *Bennett* factor, it is also 'by far the most important factor' in evaluating a class action settlement." *Figueroa*, 517 F. Supp. 2d at 1323 (citation omitted). Here, Plaintiff's likelihood of success at trial is far from certain.

9

Plaintiff alleged that Defendant violated the TCPA when he received a voicemail message delivered by an automatic telephone dialing system ("ATDS") to send prerecorded telemarketing robocalls advertising Defendant's services. (DE 1 ¶¶ 22-26). Far from a clear violation of the TCPA, whether Defendant's conduct violated the TCPA is an open question given that the technology Defendant used "bypasses the wireless telephone and telephone subscriber altogether, creating a direct communication between . . . servers and the voicemail system of the carrier telephone company. (DE 32, Blaylock Decl. ¶ 6). The technology "communicate[s] directly with the carrier telephone companies' computers without placing a direct call to the subscriber" and "delivers voicemail messages without a resulting charge on the recipient's cellular telephone bill for such delivery, or showing up as a received call on the cellular telephone bill." (DE 32, Blaylock Decl. ¶ 7-8). Accordingly, in Defendant's motion for summary judgment, it claims that this case "raises an issue of first impression under the TCPA; that is, whether delivery of a voicemail message directly to Plaintiff's wireless service provider constitutes making a "call" within the meaning of the TCPA so as to confer upon Plaintiff standing to pursue his claims." (DE 32 at 18). Defendant also represents that "[n]either the FCC nor any court has opined on this issue." (*Id.*). Indeed, there was a FCC petition filed on March 31, 2017, which was subsequently withdrawn, that sought the FCC's guidance on whether "the delivery of a voice message directly to a voicemail box . . . constitute[s] a call that is subject to the prohibitions on the use of an ATDS or an artificial or prerecorded voice that are set forth in the TCPA." (DE 33 at 5). Because of the novel issues presented by this litigation, there was a substantial risk to Plaintiff and the class members if they proceeded to trial.

Defendant also raises numerous other defenses to Plaintiff's allegations. Defendant asserts that even if the direct delivery of a voicemail was a cognizable harm under the TCPA,

Plaintiff lacked Article III standing because Plaintiff cannot show an actual, particularized, and concrete harm that Plaintiff suffered as a result of the delivery of the voicemail. (DE 32 at 16 (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016))). At the Final Fairness Hearing, Defendant also represented that it would defend against Plaintiff's claims by asserting that voicemail is an "enhanced service, and not a telecommunications service" under Title II of the Communications Act, which includes the TCPA. (*See* DE 33-4 at 9-11). Thus, the novel legal issues presented by this case and Defendant's potentially meritorious defenses weigh heavily in favor of the reasonableness of a settlement to resolve Plaintiff and the class members' claims.

      *iii.*    *Range of Possible Recovery and the Point at which a Settlement is Fair, Adequate, and Reasonable*

"The second and third considerations of the *Bennett* test are easily combined. A court first determines the range of recovery by resolving various damages issues. The court then determines where in this range of possible recovery do fair, adequate, and reasonable settlements lie." *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 541 (S.D. Fla. 1988). "The range of possible recovery spans from a finding of non-liability to a varying range of monetary and injunctive relief. In considering the question of a possible recovery, the focus is on the possible recovery at trial." *Saccoccio*, 297 F.R.D. at 693 (internal quotations and citations omitted). "A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Behrens*, 118 F.R.D. at 542.

The TCPA provides for statutory damages of no less than $500 per call violating the TCPA, along with injunctive relief, and up to $1,500 per call for willful or knowing violations of the TCPA. *See* 47 U.S.C. § 227(b)(3). Given that there was a Settlement Class of 374,399 total members (DE 61-1, Azari Decl. ¶ 13), if each class member was able to prove one violation of the TCPA, the range of recovery would be between $187,199,500 and $561,598,500. Plaintiff's

counsel also represented at the Final Fairness Hearing that some of the class members received several voicemails from Defendant, which would potentially increase the aforementioned statutory range of recovery by several factors.  On the other hand, the Parties represent that "Defendant has exchanged confidential financial information with Plaintiff and the Mediator . . . [from which] counsel for Plaintiff has determined that any "'possible *recovery*' is in a range exponentially below the amount of statutory damages of $500.00 per call." (DE 52 at 15). "[H]ad Plaintiff successfully secured a judgment on behalf of the entire class for the amount of calls made, Defendant likely would have been put out of business and no recovery would have been made whatsoever." (DE 52 at 14). Thus, "the Parties agreed that monetary relief be based not only on the merits and strength of Plaintiff's claims and defenses, but also on an assessment of Defendant's ability to pay." (DE 52 at 15).

Turning to the agreed-upon settlement, the Settlement Agreement gave class members the option to choose either a $4.00 cash award or a $15.00 voucher to be used at Defendant's Naples Nissan dealership. (Settlement Agreement, ¶¶ 2.6, 2.46, 3.1).  The Settlement Agreement also enjoined Defendant from continuing to use the "drop voicemail" technology at issue in this litigation unless such technology is deemed not to violate the TCPA by the FCC, Supreme Court, or Eleventh Circuit. (*Id.* at ¶ 3.7). If every class member submitted an approved claim for the cash award, Defendant agreed to make available $1,520,000.00 cash to compensate the claimants. (*Id.* at ¶ 3.1). If every class member submitted an approved claim for the voucher award, Defendant agreed to make available $5,700,000.00 in voucher awards to compensate the claimants. (*Id.* at ¶ 3.2). Notably, since this is a "claims-made settlement" where Defendant does not deposit the settlement amount into a common fund but only compensates approved

claimants, the Defendant retains all amounts not paid out to approved claimants. (*See Id.* at ¶¶ 3.1, 3.2).

In evaluating whether the recovery obtained by the Settlement Agreement is fair, adequate, and reasonable, it is important to note that class members could choose either a $4.00 cash award *or* a $15.00 voucher to Nissan Naples. If this settlement is characterized as a "coupon settlement" under the Class Action Fairness Act ("CAFA"), the court must apply a "greater level of scrutiny" to the fairness of the settlement. *Figueroa*, 517 F. Supp. 2d at 1321; *see* 28 U.S.C. § 1712. In requiring closer scrutiny of coupon settlements, "Congress emphasized its concern about settlements when class members receive little or no value, including settlements in which 'counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value.'" *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 952 (9th Cir. 2015) (quoting Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2, 119 Stat. 4 (2005)). "The potential for abuse [with coupon settlements] is greatest when the coupons have value only if a class member is willing to do business again with the defendant who has injured her in some way, when the coupons have modest value compared to the new purchase for which they must be used, and when the coupons expire soon, are not transferable, and/or cannot be aggregated." *In re Southwest Airlines Voucher Litig.*, 799 F.3d 701, 706 (7th Cir. 2015).

Here, the $15.00 voucher to Nissan Naples bears the hallmarks of the coupon settlements that Congress sought to more closely scrutinize because (1) the voucher can only be used at Naples Nissan, the entity that allegedly harmed the class, (2) the coupons have modest value compared to what individuals can purchase at Nissan Naples, including cars and services for

vehicles,[3] (3) the coupons expire within one year of issuance, and (4) they are not redeemable for cash. (*See* Settlement Agreement, ¶ 2.46). On the other hand, the coupons are "freely transferrable," require no minimum purchase, and are good on all merchandise, including discounted goods or services. (*Id.*).

Despite the fact that the coupons provided as part of the Settlement Agreement may be subject to the coupon settlement provisions of CAFA, since the benefit offered to class members is "an option between cash and nonpecuniary relief," the Court follows other courts in not "characterize[ing] these as coupon settlements, [because] class members are not required to take the pecuniary relief." 4 William B. Rubenstein, *Newberg on Class Actions* § 12:11 (5th ed. 2011); *see, e.g.*, *DVD-Rental*, 779 F.3d at 952 (noting that since "the claimants in this case had the option of obtaining cash instead of a gift card," the settlement did not "force[] them to buy from the defendant" and therefore it was not a coupon settlement); *CLRB Hanson Indus., LLC v. Weiss & Assocs., PC*, 465 F. App'x 617, 619 (9th Cir. 2012); *O'Brien v. Brain Res. Labs, LLC*, No. 12-204, 2012 WL 3242365, at *19 n.8 (D.N.J. Aug. 9, 2012) (noting settlement that provides cash or coupon option was not coupon settlement, but that if "the settlement offered only a coupon option to the class, it is highly unlikely it would have been approved, given that such relief would provide little value to the class, while servicing as a 'tremendous sales bonanza' for Defendant"). The weight that the Court is giving to class members' choice of relief in the Settlement Agreement in determining that this Settlement Agreement is not a coupon settlement is reinforced by the fact that 95.2% of the 7,630 claims submitted by class members were for the

---

[3] When the Court asked Defendant at the Final Fairness Hearing what an individual could purchase at Nissan Naples for $15.00, Defendant's counsel stated that an oil change cost between $8.00 and $11.00. The Court questions whether there is anything at Nissan Naples that does not require a customer to "spend any of his or her own money" along with the voucher to purchase something. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 951 (9th Cir. 2015).

cash award, not the voucher. Though it is unclear whether the Nissan Naples voucher provides real value to class members, the fact that the Settlement Agreement provides class members with a cash award option that virtually all of the claimants selected leads the Court to conclude that this is not a coupon settlement subject to the provisions of 28 U.S.C. § 1712.

The cash award of $4.00 made available to class members is just a miniscule .8% of the potential minimum statutory award of $500.00 for a single violation of the TCPA. That percentage would decrease if a class member received multiple voicemails from Defendant in violation of the TCPA, as a class member can only recover $4.00 regardless of how many voicemails they received at a given phone number. In total, based on the claims submitted by the class, the maximum cash value that will have to be paid to the class by Defendant is $29,068,[4] and the maximum value of vouchers given to the class by Defendant is $5,445.[5] However, even though the total cash recovery for each class remember reflects a maximum of eight-tenths of a percent of the statutory recovery for a single violation, the Court still finds that the recovery here is fair, reasonable, and adequate. *See Behrens*, 118 F.R.D. at 542. In addition to recovering either a $4.00 cash award or a $15.00 Nissan Naples voucher, all class members benefitted from the injunctive relief obtained by Plaintiff that stops Defendant from using the "drop voicemail" technology at issue in this case. The Court also considers Defendant's ability to promptly pay the amounts in the Settlement Agreement, and the possibility that the class members would not be able to recover at all, either due to the novel legal issues in this case or due to Defendant's purported inability to pay the class members anything should all class members be entitled to recover. Accordingly, the Court agrees with the Parties that "[t]he proposed structure maximizes the total amount available to the Settlement Class while simultaneously considering Defendant's

---

[4] Calculated by multiplying 7,267 total cash award claimants by $4.00 cash award.
[5] Calculated by multiplying 363 total voucher claimants by $15.00 voucher value.

immediate ability to pay the class" (DE 52 at 15), and therefore the recovery by claimants is fair, adequate, and reasonable.

    *iv.  Complexity, Expense, and Duration of the Litigation*

   As discussed above, the issues raised in this case are both novel and complex, especially given that no court or the FCC has ruled on a dispositive issue in this case. The Parties represent that this was "hard-fought litigation" and that significant time and energy has already been expended by the Parties, including hiring a TCPA expert, conducting discovery, filing and responding to dispositive motions, and conducting settlement negotiations and reaching an agreement. (*See* DE 60 at 10-11). In addition, the Parties represented at the Final Fairness Hearing that regardless of which party prevailed in the Court, the opposing party would likely continue to appeal and litigate this matter given the novel issues of law presented. Thus, given the truly novel and complex issues presented in this litigation, the substantial expenses already incurred by the Parties, and the potential for expensive and time-consuming litigation absent a settlement, this factor weighs in favor of approving the Settlement Agreement.

    *v.  Substance and Amount of Opposition to the Settlement*

   "The reaction of the class [to the settlement] is an important factor." *Saccoccio*, 297 F.R.D. at 694 (internal quotations and citations omitted). Here, there were no objections filed to the settlement agreement. This lack of opposition weighs strongly in favor of the Court's approval of the Settlement Agreement.

    *vi.  Stage of Proceedings at which Settlement was Achieved*

   "The stage of the proceedings at which settlement is achieved is "evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Saccoccio*, 297 F.R.D. at 694

(citations omitted).   In addition, "[e]arly settlements are favored" such that "vast formal discovery need not be taken." *Id.* (citations omitted).

Here, the Parties settled early in the litigation, before Plaintiff's putative class was certified, and both Plaintiff and Defendant has sufficient information to adequately evaluate the merits of the case and to weigh the benefits of continuing to litigate this matter.  Plaintiff represents that "[i]mmediately after the Rule 26 conference, Plaintiff propounded extensive discovery on Defendant, regarding all automated calling and texting practices." (DE 63 at 2). Defendant responded to Plaintiff's discovery requests and filed a motion for summary judgment on the aforementioned novel legal issues related to the TCPA's application here. (*See* DE 63 at 2).  Plaintiff also enlisted an expert, Randall Snyder, "who has extensive experienced [sic] with the TCPA," to better evaluate its claims and the merits of Defendant's arguments. (DE 46 at 14-17).  All of this occurred before the Parties moved to certify the class and preliminarily approve the Settlement Agreement. (*See* DE 52).  Accordingly, the early settlement reached between the Parties and the extent to which the Parties were informed about the merits of their claims and defenses weighs in favor of approving the Settlement Agreement.  Thus, the Court finds the Settlement Agreement to be a fair, adequate, and reasonable resolution of the class members' claims and approves the Settlement Agreement.

III.   Attorneys' Fees and Costs, and Class Representative Award

     a.  *Attorneys' Fees and Costs*

In Plaintiff's Fees and Costs Motion, Plaintiff's counsel requests $500,000 in attorneys' fees and $15,184.91 in costs and expenses. (DE 60 at 19).  Defendant agreed not to dispute any request by Plaintiff's counsel for attorneys' fees up to $500,000.00 and for costs up to $20,000.00. (Settlement Agreement, ¶ 4.2).  As the Court has already determined that this is not

a coupon settlement, the Court is not bound to calculate reasonable attorneys' fees subject to the provisions of 28 U.S.C. § 1712.  Instead, to determine attorneys' fees "in a case involving a class action settlement that created a reversionary common fund, [the Eleventh Circuit] held that 'attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class.'"  *Poertner*, 618 F. App'x at 628 (quoting *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 770, 774-75 (11th Cir. 1991)).   "The percentage applies to the total fund created, even where the actual payout following the claims process is lower."  *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007) (citing *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-96 (11th Cir. 1999)).

Here, even though the value of the unused cash awards and voucher coupons revert back to Defendant (*see* Settlement Agreement, ¶¶ 3.1, 3.2), the Settlement Agreement does not provide for a reversionary fund, but instead is a "claims-made settlement." (*See, e.g.*, DE 63 at 16).  That is because the Defendant "never pa[id] money into a fund but satisfies all claims up to a certain ceiling," which is up to $5,700,000 in voucher awards and $1,520,000 in cash awards. *See 4 Newberg on Class Actions* § 15:70.  Significantly, the Eleventh Circuit in *Poertner* held that:

> While no published opinion extends *Camden I*'s percentage-of-recovery rule to claims-made settlements, no principled reason counsels against doing so. For, as one learned treatise aptly illustrates, properly understood '[a] claims-made settlement is . . . the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant'; indeed, the two types of settlements are 'fully synonymous.'

*Poertner*, 618 F. App'x at 628 n.2 (quoting 4 William B. Rubenstein, *Newberg on Class Actions* § 13:7 (5th ed. 2011)).  Thus, the percentage-of-recovery rule applies to this Settlement Agreement.  The court in *Camden I* noted that 20% to 30% is the median "percentage fee award which may be adjusted in accordance with the individual circumstances of each case." *Camden*

*I*, 946 F.2d at 775. "[T]he majority of fees in these cases are reasonable where they fall between 20-25% of the claims." *Faught*, 668 F.3d at 1242. When considering the appropriate percentage on which to base an attorneys' fee award, the Court in *Camden I* still instructed courts to further evaluate common fund awards based on reasonableness factors set out in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974).[6] *See Camden I*, 946 F.2d at 775. In particular, "[w]here the requested fee exceeds 25%, the court is instructed to apply the *Johnson* factors. *Faught*, 668 F.3d at 1242. After analyzing the amount of attorneys' fees under the "percentage-of-recovery rule" under *Camden I*, "[s]ome courts use the lodestar method as a cross-check of the percentage of the fund approach." *See, e.g., Pinto, Ltd.*, 513 F. Supp. 2d at 1343.

In Plaintiff's Fees and Costs Motion (DE 60), Plaintiff's counsel requests $500,000.00 in attorneys' fees, which it says represents "less than nine percent of the settlement funds Plaintiff made available to the Class Members from the Defendant." (DE 60 at 2). In arriving at this percentage, Plaintiff uses the maximum possible value of the voucher fund made available by Defendant, $5,700,000. (*Id.*; *Id.* at 15 (claiming to have "negotiated a $5.7 million fund to be

---

[6] The *Johnson* factors include:
      (1) the time and labor required;
      (2) the novelty and difficulty of the questions involved;
      (3) the skill requisite to perform the legal service properly;
      (4) the preclusion of other employment by the attorney due to acceptance of the case;
      (5) the customary fee;
      (6) whether the fee is fixed or contingent;
      (7) time limitations imposed by the client or the circumstances;
      (8) the amount involved and the results obtained;
      (9) the experience, reputation, and ability of the attorneys;
      (10) the "undesirability" of the case;
      (11) the nature and the length of the professional relationship with the client;
      (12) awards in similar cases.
*Camden I*, 946 F.2d at 772 n.3.

made available to pay claims of the class members)). This calculation is problematic for two reasons. First, the voucher awards cannot be redeemed for cash and are considered to be compensation in kind, which "is worth less than cash of the same nominal value." *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001). Thus, Plaintiff's calculations based on the $5,700,000 value of the voucher fund are inaccurate because that fund is worth less than if the fund were for $5,700,000 in cash. *See Figueroa*, 517 F. Supp. 2d at 1327; *Redman v. RadioShack Corp.*, 768 F.3d 622, 628 (7th Cir. 2014). Second, and more importantly, if the Court were to calculate a reasonable attorneys' fee for Plaintiff's counsel based on the total value of the voucher fund, the Court would be required to apply the coupon settlement attorney's fee provisions of 28 U.S.C. § 1712. In doing so, the Court would calculate the attorney's fee either by using "the value to class members of the coupons that are redeemed," § 1712(a), or, since the class members also received injunctive relief from Defendant here, by using the lodestar method, § 1712(b)(1). However, since this is not a coupon settlement, as already discussed, the Court declines to apply § 1712 or use the total value of the voucher settlement fund in calculating reasonable attorney's fees.

In a Supplemental Brief filed by Plaintiff in support of his Unopposed Motion for Attorneys' Fees ("Supplemental Brief"), pursuant to the Court's request at the Final Fairness Hearing, Plaintiff, for the first time, argues that the attorneys' fees calculation should be based on the total possible value of the cash award fund, or $1,497,586.[7] (DE 68 at 3). Defendant also argues that the total benefit from which the attorneys' fees should be calculated should include the maximum of $500,000 in attorney's fees and $185,000 administration expenses that

---

[7] Though the Settlement Agreement states that Defendant has agreed to make available $1,520,000 (Settlement Agreement, § 3.1), Plaintiff's Supplemental Brief uses a cash fund value of $1,497,596 because it is based on the Settlement Administrator's finding of 374,399 unique phone numbers in the class, not 380,000 as previously believed. (DE 68 at 3).

Defendant agreed not to dispute as part of the Settlement Agreement, and the $15,000 incentive award for the named Plaintiff, for a total benefit of $2,197,596. (DE 68 at 3). As part of the Settlement Agreement, Defendant agreed to pay the attorneys' fees, costs, and incentive award "separately and in addition to any amounts paid out of the Settlement Cash Fund." (Settlement Agreement, ¶¶ 4.1, 4.2).

In considering how to calculate the total value recovered by the class for the purposes of a fee award, "no case has held that a district court must consider only the actual payout in determining attorneys' fees." *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295 (11th Cir. 1999); *see Carter v. Forjas Taurus, S.A.*, __ F. App'x __, 2017 WL 2813844, at *5 (11th Cir. 2017) (noting that calculating attorney's fees based on amount actually paid to the class "is not required by [Eleventh Circuit] precedent"). Accordingly, the Court here will not look to the total amount paid out to the class here, a maximum of $34,513,[8] but, consistent with Plaintiff's position in its Supplemental Brief, will look to the total potential cash award that could have been obtained by the class, or $1,497,596. (DE 68 at 3); *see also* 4 *Newberg on Class Actions* § 12:11.

Plaintiff argues in its Supplemental Brief that for the purposes of calculating what is a reasonable attorneys' fee, the Court should calculate the total benefit to the class as a "constructive common fund," which, as previously mentioned, would include the maximum agreed-upon attorneys' fees, costs, and incentive award, for a total of $2,197,596. (DE 68 at 3-5). To support its argument that reasonable attorneys' fees should be calculated based on a constructive common fund, Plaintiff cites to the § 21.7 of the Manual for Complex Litigation, and to several cases, including *In re Managed Care Litig. v. Aetna Inc.*, No. 1334, 2003 WL

---

[8] Calculated by adding the total cash value paid to the class, $29,068 (7,267 claimants multiplied by $4.00 cash award), plus $5,445 (363 claimants multiplied by $15.00 voucher).

21

22850070 (S.D. Fla. Oct. 24. 2003).   Neither of these sources uses the term "constructive common fund." In *In re Managed Care Litig.*, the court added the agreed fee and cost award to the "total benefits being given directly to the Class" to evaluate the reasonableness of the fee. 2003 WL 22850070, at *6.  The Manual for Complex Litigation seemingly endorses calculating reasonable attorneys' fees based on a total fund that includes the settlement fund and the upper limit of the agreed-upon fee.  Manual for Complex Litigation (Fourth) § 21.7 (2011).

However, several courts in the Eleventh Circuit have evaluated the reasonableness of an attorneys' fee award by only looking to the "fund established for the benefit of the class," not including any agreed-upon attorney's fees, costs, or incentive awards. *See, e.g., Carter*, 2017 WL 2813844, at *2, *5 (affirming district court's fee award and evaluating reasonableness of $8.3 million fee award in relation to $30 million cash fund for class members that did not include fees or incentive award); *Saccoccio*, 297 F.R.D. at 690, 695 (evaluating reasonableness of $20 million fee award in relation to $300 million monetary recovery when the fee award amount was "paid by Defendants in addition to the $300 million available to the class" in claims-made settlement).

Here, the total benefit to the class was identified as a maximum cash award of $1,497,596, and the attorneys' fees and costs, and incentive award, are to be paid in addition to any amounts paid out of the settlement cash fund.  (*See* Settlement Agreement, ¶¶ 4.1, 4.2). Accordingly, in determining the reasonableness of the attorneys' fee award, the Court will consider the maximum cash settlement fund value to class members, $1,497,596, along with the nonmonetary, injunctive relief obtained in calculating a reasonable attorneys' fee. *See Poertner*, 618 F. App'x at 630.  In just looking to the reasonableness of a $500,000 attorneys' fee request

in relation to the maximum cash settlement fund value of $1,497,596, the attorneys' fee represents a bench mark of 33.4%.

It is also important to recognize that the cash benefits obtained by the class are supplemented by the injunctive relief afforded to class members.  As previously mentioned, Plaintiff's counsel negotiated an injunction whereby Defendant agrees to stop violating the TCPA and to "stop using 'drop voicemail' technology to leave pre-recorded messages in people's voicemail inboxes without consent." (Settlement Agreement, ¶ 3.7).  Plaintiff states that this injunction advances "[o]ne of the primary purposes behind the TCPA . . . to prevent the invasion of privacy that happens when unwanted telemarketing calls are made to cell phone[s]" and that "Plaintiff's success in stopping these calls and achieving injunctive relief cannot be overstated." (DE 60 at 15).  The Court agrees that this injunctive relief is not illusory and in fact provides a real benefit to class members in requiring Defendant to stop using a technology of uncertain legality under the TCPA.  *See, e.g.*, *Poertner*, 618 F. App'x at 629; *Saccoccio*, 297 F.R.D. at 698.  However, the Court is unsure how to assign a value to the injunctive relief, as Plaintiff submitted no evidence regarding an estimated value of the relief.  Where, as here, the monetary value of the injunctive relief cannot be ascertained, "courts should consider the value of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees, rather than as part of the fund itself." *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003); *see also Pinto*, 513 F. Supp. 2d at 1342-43.  Accordingly, the Court calculates the bench mark to be 33.4% based on the attorneys' fee request and the maximum settlement cash fund value of $1,497,596, and will consider the injunctive relief obtained in adjusting the proper bench mark. *See Pinto*, 513 F. Supp. 2d at 1339-43 (calculating bench mark based on attorneys' fee request in relation to

monetary common fund obtained while acknowledging injunctive relief also obtained for class). Since the bench mark is greater than 25%, the Court applies the *Johnson* factors. *Faught*, 668 F.3d at 1242.

Certain *Johnson* factors direct the Court to award attorneys' fees based on a bench mark rate on the high end of *Camden I*'s 20-30% range. The time and labor that Plaintiff's counsel was required to expend on this litigation was extensive in a short time frame, especially from March through May 2017, spending a total of 394 hours in this litigation. (DE 68, Miltenberger Supp. Decl.). Given the rapid pace of litigation, it is no surprise that class counsel was precluded from other employment at the time. (DE 60 at 13). As previously discussed, the issues in this case have not been decided by any other court or the FCC, and the skill required by class counsel to represent a class in a case like this is substantial. (*See* DE 60 at 11-12). The attorneys here also had substantial experience and success in litigating class actions. (*See* DE 60, Miltenberger Decl., Hill Decl.). The novelty of the issues in this case, and the fact that the case was taken on a contingency basis, with great risk to class counsel, supports the undesirability of this case to class counsel. *See Behrens*, 118 F.R.D. at 548; (*See* 60 at 14 ("Class Counsel undertook significant financial risk in prosecuting this case because it was taken on a contingency basis with no guarantee of recovery.").

However, other *Johnson* factors, namely the amount involved and results obtained, the customary fee, and the awards in similar cases weigh against a bench mark award in the high end of *Camden I*'s range. Each approved claimant in the class has a choice between just $4.00 cash or a $15.00 voucher to Naples Nissan. In other class action settlements under the TCPA, the cash value settlement for each claimant was exponentially larger. *See James v. JPMorgan Chase Bank, N.A.*, No. 15-cv-2424, 2017 WL 2472499, at *1 (M.D. Fla. June 5, 2017) (approving

attorneys' fee award reflecting 30% bench mark when "[e]ach claimant will receive approximately $81, which equals or exceeds the recovery in a typical TCPA class action"); *Family Med. Pharm., LLC v. Trxade Grp., Inc.*, No. 15-0590, 2017 WL 1042079, at *6, *13 (S.D. Ala. Mar. 17, 2017) (same, approving attorneys' fee award reflecting 25% bench mark in TCPA class action settlement when class members "will recover money damages of approximately $302.79 each); *Hashw v. Dep't Stores Nat'l Bank*, 182 F. Supp. 3d 935, 944, 949-50 (D. Minn. 2016) (awarding attorneys' fees representing 20% bench mark, less than the 33% bench mark requested, when TCPA class action settlement yielded $33.20 per claimant, and collecting TCPA class action settlement cases awarding bench marks between 8% and 34%); *In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 790, 795-809 (N.D. Ill. 2015) (awarding attorneys' fee representing 20.77% of bench mark, less than the 32% bench mark requested, when TCPA class action settlement yielded $34.60 per claimant). In light of the high 33.4% bench mark that a $500,000 fee award would represent and the correspondingly low per-claimant recovery recovered for the class, the Court finds that a lower bench mark would be appropriate in this case. Considering the injunctive relief obtained for the class, the *Johnson* factors (particularly the novelty of the issues, the undesirability of the case, and the fact that the case was taken on contingency), and *Camden I*'s guidance, the Court finds that a bench mark of 23% is reasonable in this case. Accordingly, the Court finds awards Class Counsel $344,447.08 in attorneys' fees.

To ensure that the attorneys' fee award is reasonable, courts may also conduct a lodestar cross-check of the fee award. *See Pinto*, 513 F. Supp. 2d at 1343 (citing *In re Sunbeam Secs. Litig.*, 176 F. Supp. 2d 1323, 1336 (S.D. Fla. 2001)). "[L]odestar multiple[r]s 'in large and complicated class actions' range from 2.26 to 4.5, while 'three appears to be the average.'" *See*

*Pinto*, 513 F. Supp. 2d at 1344 (quoting *Behrens*, 118 F.R.D. at 549).   At the Court's request, Plaintiff's counsel submitted documentation and sworn declarations supporting a lodestar analysis, including information about the attorney experience for each of Plaintiff's attorneys, the number of hours billed, and the hourly rate that each attorney charged.   (DE 68, Exs. A, A-1, A-2, B).   To calculate the lodestar, a court must "multiply the number of hours reasonably expended by a reasonable hourly rate." *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994).   To calculate a reasonable hourly rate, a court looks to "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Id.* (quoting *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988)).   Notably "[a] court is itself an expert on the question of whether an attorney's rate is reasonable" and that "[i]n determining whether a rate is reasonable, I 'may consider [my] own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Osorio v. State Farm Bank, F.S.B.*, No. 11-61880, 2013 WL 12085502, at *4 (S.D. Fla. Feb. 1, 2013) (Middlebrooks, J.) (quoting *Loranger*, 10 F.3d at 781).

Here, Plaintiff's counsel submits that Chris Miltenberger, an attorney with 35 years of experience, billed at a rate of $625 per hour, Brandon Hill, an attorney with 10.5 years of experience, billed at a rate of $350 per hour, and Rebecca Miltenberger, an attorney with 18 years of experience, billed at a rate of $450 per hour.   (DE 68, Miltenberger Supp. Decl., ¶ 31).   In looking to other courts in this Circuit that have evaluated reasonable hourly rates in consumer protection class action settlements, it appears that Plaintiff's counsel's rates are unreasonably high.   *See, e.g., Trxade Grp., Inc.*, 2017 WL 1042079, at *10 n.10 (reducing Plaintiff's counsel's hourly rate from $450 to $300 in TCPA class action settlement for purposes of lodestar cross-

check); *Arlozynski v. Rubin & Debski, P.A.*, No. 09-cv-02321, 2011 WL 6319190, at \*3-4 (M.D. Fla. Nov. 21, 2011) (reducing hourly rate from $480 to $350 in class action settlement under Fair Debt Collection Practices Act ("FDCPA") even when counsel was experienced in class actions under FDCPA and TCPA); *Silver v. Tenet Healthcare Corp.*, 2014 WL 12167305, at \*5 (S.D. Fla. Feb. 27, 2014) (finding $375 and $350 to be reasonable hourly rates for attorneys with over thirty years of experience, and $300 for attorney with seven years of experience in FDCPA class action settlement); *Gonzalez v. Dynamic Recovery Solutions, LLC*, 2015 WL 738329, at \*4 (S.D. Fla. Feb. 23, 2015) (finding hourly rate of $400 to be reasonable in FDCPA class action settlement). Accordingly, consistent with hourly rates considered to be reasonable in analogous cases, the Court reduces the hourly rates of Plaintiff's Counsel to $400 for Chris Miltenberger, $300 for Brandon Hill, and $350 for Rebecca Miltenberger.

In calculating hours reasonably expended by counsel, a court must ensure that "excessive, redundant, or otherwise unnecessary hours should be excluded from the amount claimed" and that attorneys requesting fees must exercise "billing judgment." *Norman*, 836 F.2d at 1301 (citations omitted). Chris Miltenberger billed 289.3 hours, Brandon Hill billed 80.6 hours, and Rebecca Miltenberger billed 24.1 hours on this case. After having reviewed the billing records for Plaintiff's counsel (DE 68, Ex. A, A-1), the Court finds that the hours billed are reasonable. Accordingly, the lodestar in this case is calculated by adding together the product of each attorney's reasonable hourly rate by their reasonable hours expended, resulting in a lodestar of $148,335.00.[9] In conducting the lodestar cross-check, the court divides the attorneys' fee award

---

[9] The lodestar for Chris Miltenberger is a $400 reasonable hourly rate multiplied by 289.3 hours expended, for a total of $115,720.00. The lodestar for Brandon Hill is a $300 reasonable hourly rate multiplied by 80.6 hours expended, for a total of $24,180.00. The lodestar for Rebecca Miltenberger is a $350 reasonable hourly rate multiplied by 24.1 hours, for a total of $8,435.00.

of $344,447.08 by the lodestar, $148,335.00, which results in reasonable multiplier of 2.32. *See Pinto*, 513 F. Supp. 2d at 1344 (noting lodestar multipliers "in large and complicated class actions range from 2.26 to 4.5" (internal quotations and citation omitted)).   Accordingly, Plaintiff's counsel is awarded $344,447.08 in attorneys' fees.

a.  *Costs*

With regard to the costs requested by Plaintiff's counsel, although "*Camden I* did not provide guidance for determination of expenses . . . there is a requirement . . . on the part of class counsel to establish that the costs are reasonable and necessary . . . to the prosecution of the case." *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298-99 (11th Cir. 1999).  Here, Plaintiff's counsel requests an award of $15,184.91 in costs and expenses.  (DE 60 at 18).  In a sworn declaration, Plaintiff's counsel represented that it incurred expenses in the form of a $4,700 mediation fee, $7,695 expert witness fee, and $1,726.34 in general filing and travel expenses.  (DE 60, Miltenberger Decl., ¶ 55).   Plaintiff's counsel also represented that it anticipated incurring an additional $1,064.57 in expenses in attending the final approval hearing.  (DE 60, Miltenberger Decl., ¶ 56).  This total costs request is within the amount Defendant agreed to pay in the Settlement Agreement.  (Settlement Agreement, ¶ 4.2).  Accordingly, given the specificity with which Plaintiff's counsel itemized the costs, the reasonableness of the costs, and Defendant's willingness to pay that amount, the Court awards Plaintiff's counsel costs in the amount of $15,184.91.

b.  *Class Representative Award*

Plaintiff requests a $15,000 incentive payment for Plaintiff as the Class Representative. "Incentive awards are not uncommon in class action litigation . . . [which] compensate named

---

The total lodestar for Plaintiff's counsel is $115,720.00 plus $24,180.00 plus $8,435.00, which equals $148,335.00.

plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006). "[T]he Eleventh Circuit has not expressly set forth guidelines for court to use in determining incentive awards, [but] there is ample precedent for awarding incentive compensation to class representatives." *Id.* In *Allapattah*, the court focused on the fact that "[t]his is not a case where lawyers inappropriately recruit plaintiffs to serve as 'figureheads' for suits the lawyers themselves want to file and settle" in granting an incentive award to class representative. *Id.* at 1220.

Here, Plaintiff's counsel represents that Plaintiff: (1) "diligently sought counsel to represent him in this matter and sought to protect the interest of individuals who had not consented to receiving the unsolicited telemarketing messages;" (2) "worked with Class Counsel to produce his phone records and to research the manner in which the 'ringless voicemails' were left on his cell phone;" (3) "attended the all-day class mediation and worked with Class Counsel to negotiate and approve the settlement;" and (4) expended considerable time and effort in this matter. (DE 60, Miltenberger Decl., ¶¶ 58-62). At the Final Fairness Hearing, Plaintiff's counsel also represented that this case was Plaintiff's first time as a class representative, and that Plaintiff was motivated to file suit in this case because he and his daughter repeatedly received the voicemails at issue in this case. However, there is no evidence that Plaintiff, as class representative, spent any of his own money on this litigation or took any real risk in bringing this litigation, as it was taken on contingency by Class Counsel. Thus, in balancing the desire to compensate the Class Representative for his effort in obtaining relief for class members with the lack of evidence of financial risks taken by Plaintiff, and the Court's general concern with class representatives becoming "figureheads" and pursuing careers as class representatives, the Court

awards Plaintiff a $10,000 incentive payment as Class Representative.  *See James*, 2017 WL 2472499, at *2 (noting that "a $5,000 fee is in line with incentive awards that courts have approved in comparable TCPA matters" (internal quotations and citations omitted)); *Trxade Grp., Inc.*, 2017 WL 1042079, at *8 (approving incentive award of $3,500.00 in TCPA class action settlement); *Schwyhart v. AmSher Collection Servs., Inc.*, No. 15-cv-01175, 2017 WL 1034201, at *3 (N.D. Ala. Mar. 16, 2017) (same, $10,000 incentive award).  An incentive award of $10,000 is reasonable and is awarded to Plaintiff as class representative.  Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

1.      This Final Approval Order and Judgment incorporates by reference the definitions in the Settlement Agreement (DE 52-1), and all capitalized terms used herein shall have the same meanings as set forth in the Settlement Agreement (DE 52-1) unless otherwise set forth in this Order.

2.      The Court has jurisdiction over the Parties, the Settlement Class Members, and the claims asserted in this Action.

3.      On June 26, 2017, the Court preliminarily approved the Settlement Agreement by entering the Order Granting Preliminary Approval of Class Action Settlement Agreement (DE 54), and notice was given to all members of the Settlement under the terms of that Order and the Order Granting Joint Motion for Relief from Court Order (DE 57).

4.      The Court finds, pursuant to Federal Rule of Civil Procedure 23(e), that the settlement of this Action pursuant to the terms of the Settlement Agreement is, and is finally approved to be, a fair, reasonable, and adequate settlement in the best interests of the Settlement Class, in light of the factual, legal, practical, and procedural considerations raised in this Action.

5.      The Court finds that the Settlement Agreement was entered in good faith following informed arm's length negotiations conducted by experienced counsel with the assistance of a well-respected mediator, and is non-collusive.

6.      The Court finds that certification for purposes of settlement is proper because (a) the Settlement Class is so numerous that joinder of all members is impractical; (b) there are questions of law and fact common to the Settlement Class, which predominate over any questions affecting only individual members; (c) Plaintiff's claims are typical of the claims of the Settlement Class; (d) Plaintiff and his attorneys will fairly and adequately protect the interests of the Settlement Class; and (e) a class action is the superior means of resolving this Action.

7.      In light of the above findings, and solely for purposes of the Settlement, the Court **CERTIFIES** this Action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3). The Settlement Class is defined as follows:

> All persons or legal entities in the United States who, during the Class Period, received a non-emergency call, text, or voicemail message from or on behalf of Naples Nissan through the use of an automatic telephone dialing system or an artificial or prerecorded voice.

8.      The Court **APPOINTS Plaintiff Mahoney** as the **representative** of the Settlement Class pursuant to Federal Rule of Civil Procedure 23(a), and **APPOINTS** Plaintiff's attorneys **Chris R. Miltenberger**, of The Law Office of Chris R. Miltenberger, PLLC, and **Brandon J. Hill**, of Wenzel Fenton Cabassa, P.A. as **Class Counsel** pursuant to Federal Rule of Civil Procedure 23(g).

9.      Based on the Settlement Agreement, Order Granting Preliminary Approval of Class Action Settlement Agreement, and upon the Declaration of Cameron Azari, Esq. (DE 61-1), the Court finds that Class Notice provided to the Settlement Class was the best notice

practicable under the circumstances, and that it satisfied the requirements of due process and Federal Rule of Civil Procedure 23(e)(1).

10. Upon the Declaration of Harrison Brown (DE 53-1), the Court finds that notice has been provided to the appropriate state and federal officials in accordance with the requirements of the Class Action Fairness Act (28 U.S.C. § 1715).

11. No objections to the Settlement Agreement or its preliminary approval were received.

12. Eight individuals timely and validly requested exclusion from the Settlement Class and the Settlement Agreement, and thus they are excluded from both. Those eight individuals are not named herein, but records of their exclusion have been and shall continue to be maintained by the Settlement Administrator and Class Counsel.

13. After due consideration of, among other things, the uncertainty about the likelihood of: (a) the Settlement Class's ultimate success on the merits; (b) the range of the Settlement Class's possible recovery; (c) the complexity, expense, and duration of the litigation; (d) the substance and amount of opposition to the Settlement Agreement; (e) the state of proceedings at which the Settlement Agreement was achieved; (f) all written submissions, declarations, and arguments of counsel; (g) after notice and hearing, the Court finds that the settlement terms fall within the range of settlement terms that would be considered fair, adequate, and reasonable. Accordingly, this Settlement Agreement should be and is **APPROVED**, and shall govern all issues regarding the settlement and all rights of the Parties and the Settlement Class Members thereunder.

14. Defendant shall make the required payments, in accordance with the amounts and the schedule set forth in the Settlement Agreement, to fund (a) Cash Awards and Voucher

Awards to Approved Claimants, in accordance with their election on the Claim Form; (b) Incentive Award; (c) Attorneys' Fees and Costs; and (d) Settlement Administration Costs.

15.     Approved Claimants shall be paid Cash Awards and Voucher Awards in the amounts and in the manner set forth in the Settlement Agreement.  The Court **APPROVES** a $10,000 Incentive Award to Plaintiff for his role as Class Representative.  The Court finds this Incentive Award to be reasonable in light of the Class Representative's willingness and efforts with respect to taking on the risks of litigation and helping achieve the results to be made available to the Settlement Class.  Those amounts shall be paid by Defendant.

16.     The Court **APPROVES** an award of attorneys' fees to Class Counsel in the total amount of $344,447.08 and $15,184.91 in costs/expenses.  Those amounts shall be paid by Defendant.

17.     The Court expressly adopts and incorporates herein all of the terms of the Settlement Agreement, and authorizes and directs implementation and performance of all the terms and provisions of the Settlement Agreement, as well as the terms and provisions hereof. The Parties to the Settlement Agreement shall carry out their respective obligations under that Agreement.

18.     This Action is **DISMISSED WITH PREJUDICE** and without taxable costs to any Party, and judgment is entered in accordance with this Order and the Settlement Agreement.

19.     Each Settlement Class Member shall be bound by the Settlement Agreement, and this Final Approval Order and Judgment, including being subject to the Release set forth below:

> In accordance with the Release, Plaintiff and all Settlement Class Members fully and irrevocably release, waive, and discharge Defendant and its employees, officers, shareholders, directors, owners, members, managers, attorneys, predecessors, successors, parents, subsidiaries, divisions, d/b/a's, and other corporate affiliates from any and all claims, actions, causes of action, obligations, debts, demands, agreements, promises, liabilities, damages, losses,

controversies, costs, expenses, and attorneys' fees of any nature whatsoever, whether based on any federal law (including the TCPA), state law, common law, contract, rule, regulation, or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, compensatory or punitive, existing before or as of the entry of the Final Approval Order and Judgment, that arise out of, concern, or relate in any way to the allegations in the Action or the TCPA, and/or which could have been raised in the Action, including, but not limited to, the use of an automatic telephone dialing system and/or prerecorded or artificial voice, and/or the delivery of voicemail messages, during the applicable statute of limitations (the "Released Claims").

20.    Settlement Class Members are hereby enjoined from asserting any Released Claims.

21.    Defendant is enjoined from future violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, and specifically from using "drop voicemail" technology to leave pre-recorded messages in people's voicemail inboxes without consent, unless such technology is deemed not to violate the TCPA by the Federal Communication Commission, the United States Supreme Court, or the United States Court of Appeals for the Eleventh Circuit.

22.    Should the Settlement Agreement be terminated under its terms, or the Effective Date not occur, then any and all orders entered pursuant to the Settlement Agreement shall be deemed vacated, and this Final Approval Order shall be void and deemed vacated.

23.    The Court retains jurisdiction over this Action, the Parties, and the Settlement Class Members, to determine all matters relating in any way to this Final Approval Order, the Order Granting Preliminary Approval of Class Action Settlement Agreement, and the Settlement Agreement, including, but not limited to, their administration, implementation, interpretation, or enforcement. The Court further retains jurisdiction to enforce this Order.

24.    Plaintiff's Unopposed Motion for Entry of Final Approval Order and Judgment (DE 63) is **GRANTED**.

34

25.     Plaintiff's Unopposed Motion for Attorneys' Fees, Costs and Expenses, and a Class Representative Service Award (DE 60) is **GRANTED IN PART**.

26.     The Clerk of Court shall **CLOSE THIS CASE** and **DENY** all pending motions as **MOOT**.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida, this _17_ day of November, 2017.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:     Counsel of Record